# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

TINA SCHNEIDER,                          Case No. 1:10-cv-747

     Plaintiff,                          Judge Timothy S. Black

  vs.

THE PROCTER & GAMBLE COMPANY,

     Defendant.

## ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This civil action is before the Court on Defendant's motion for summary judgment

(Doc. 9) and the parties' responsive memoranda (Docs. 23, 25, 28).[1]

## I.     BACKGROUND

Plaintiff, a Hispanic female with Rheumatoid Arthritis ("RA"), filed this civil

action alleging: (1) race discrimination; (2) national origin discrimination; and

(3) disability discrimination.

Plaintiff was employed by Defendant Procter & Gamble Distributing LLC

("P&G") for two years as a Customer Merchandising Solutions Display Planner.

Defendant claims that Plaintiff was unable to fulfill the basic expectations of the job and

---

[1] Plaintiff requests oral argument on this motion. (Doc. 23). The Court finds however that the pleadings are clear on their face, and that oral argument is not necessary. *See also Whitescarver v. Sabin Robbins Paper Co.*, Case No. C-1-03-911, 2006 U.S. Dist. LEXIS 51524, at *7 (S.D. Ohio July 27, 2006) (C. J. Dlott) ("Local Rule 7.1(b)(2) leaves the Court with discretion whether to grant a request for oral argument.").

despite training, coaching, and structured performance management, continued to make the same mistakes. After failing to meet the expectations set forth on a performance improvement plan, Plaintiff's employment was terminated.

Conversely, Plaintiff alleges that her position required twelve months of training, but that the employee assigned to train her was such a poor performer that his training duties were taken away, and Plaintiff was assigned to another employee for training six months after she started. (Doc, 20 at 63; Doc. 18 at 25). Plaintiff maintains that P&G ignored evidence that her trainer, Mr. Reed, a Caucasian U.S. born individual with no known disability, received repeated warnings for poor performance yet remained employed by P&G while Plaintiff was terminated. Additionally, Plaintiff claims that after she told her manager, Ms. Taylor, about her RA and its symptoms, Ms. Taylor began issuing performance-based discipline, and within six weeks, recommended Plaintiff's termination.

## II.     UNDISPUTED FACTS [2]

### A.     CMS ORGANIZATION AND DISPLAY PLANNER ROLE

1.     P&G's Customer Merchandising Solutions ("CMS") organization is responsible for customization, which is the development, design, and manufacture of temporary displays, including special packaging of products, such as a full-size shampoo with a travel size hair spray, based on the specific demands of an individual retailer, such as Target or Wal-Mart. (Doc. 17 at 9-10; Doc. 18 at 12-13; Doc. 21 at 15-16).

2.     The CMS organization officially launched in July 2007, as an effort to

---

[2] *See* Docs. 9, Ex. 2 and 23, Ex. 2.

centralize P&G's customization work.  (Doc. 17 at 9; Doc. 18 at 12-13, 26; Doc. 21 at 30, 74).

3.  Prior to this time, customization work was housed separately in P&G's various business units.  (Doc. 17 at 9; Doc. 18 at 12-13).

4.  Centralization allows for greater flexibility and provides the ability for CMS to "flow to the work" and move categories around when business is heavy or light.  (Doc. 17 at 77).

5.  Within CMS, Display Planners play a critical role by managing a significant portion of the supply chain against frequent changes in customer demands and the availability of all of the required components, both within P&G and from external suppliers.  (Doc. 20 at 58-60, Ex. 5).

6.  The Display Planner must develop a production plan that meets P&G's customer service, cash, and cost goals.  (Doc. 21 at 44-45).

7.  Display Planner responsibilities include "loading and maintaining accurate data in SAP and supporting logistics systems and developing production plans to match demand."  (Doc. 20 at 58-60, Ex. 5; Doc. 21 at 44-45).

8.  The role involves "an extraordinary level of change management which requires extreme care to ensure master data and inventory accuracy, Purchase to Payment timeliness, and transactional data accuracy" and requires "complex problem-solving skills to manage many competing priorities and the ability to continuously prioritize efforts to respond to ever-changing business needs in a dynamic environment."  (Doc. 20, Ex. 5).

9.  Display Planners must be able to "consistently perform daily, weekly, and monthly processes independently, without prompting" in a "data intensive and fast-paced environment", and should be able "to anticipate problems before they occur and prevent them from becoming an issue."  (Doc. 20, Ex. 5).

10.  In lay terms, display planners "need to be accurate and precise in the information that they are providing internally to P&G, as well as externally to [P&G's] third-party suppliers" because display planners are the key to coordinating all of the "moving parts" of the supply chain.  (Doc. 21 at 44-45).

### B. PLAINTIFF'S EMPLOYMENT HISTORY

11.    Plaintiff commenced her employment with P&G in May 2007, as a Hair Care Display Planner.  (Doc. 20 at 56, Ex. 4).

12.    Plaintiff was one of three new Display Planners hired as part of the centralization process, all of whom were assigned to Hair Care and Skin Care, and were eventually supervised by CMS Category Manager, Gerry Mitten.  (Doc. 18 at 12-13, 23-25, 45).

13.    The Hair Care and Skin Care groups in CMS also included two long-term experienced Display Planners: Karen Metz in Skin Care, and Karen Donnelly in Hair Care.  (Doc. 18 at 23-25, 39, 43, 45, 57).[3]

### C. DISPLAY PLANNER TRAINING AT P&G

22.    Because of the complexity of the position, new Display Planners at P&G receive intensive training before performing any planning on their own. (Doc. 20 at 60, Doc. 18 at 17-20, 26).[4]

23.    Display Planners receive training on SAP and other software tools, as well as training regarding the particular business they are supporting.  (Doc. 18 at 17-20).[5]

26.    Newly hired Display Planners are assigned to work with an experienced Display Planner who functions as their trainer.  (Doc. 18 at 20, 24-26; Doc. 21 at 20).[6]

27.    Because of the complexity of the Display Planner job, the new hires shadow

---

[3]  Defendant claims that Jason Reed was also experienced in Hair Care, but Plaintiff maintains that a jury could question the quality of Mr. Reed's experience.

[4]  Plaintiff claims that she was supposed to receive such training, but did not.  (Doc. 21 at 140, 141; Doc. 18 at 41-42 and Ex. 1; Doc. 20 at 80-81).

[5]   Plaintiff claims that she was supposed to receive such training, but did not.  (Doc. 21 at 140, 141; Doc. 18 at 41-42, Ex. 1; Doc. 20 at 80-81).  Additionally, Plaintiff alleges that she could not sign up for any additional classes because Ms. Taylor cancelled them.  (Doc. 21, Ex. 4).

[6]  With respect to undisputed facts 26-31, Plaintiff admits that she was supposed to receive intensive training as described, but denies that she received such training.  (Doc. 21 at 140, 141; Doc. 18 at 41-42, Ex. 1; Doc. 20 at 80-81).

his or her trainer for weeks or even months before performing certain tasks and planning on their own.  (Doc. 18 at 26; Doc. 20 at 60).

28.     Once the initial training period ends, the trainer of a newly hired Display Planner continues to provide the new hire with training on issues as needed and acts as a coach answering questions and helping to solve problems. (Doc. 18 at 26).

29.     Display Planners also work together in a close environment, which allows any Display Planner to ask questions or seek assistance from any other planner.  (Doc. 20 at 64-66).

30.     At the start of their employment, Plaintiff and the other two new hires each were assigned an experienced Display Planner in their group for training. (Doc. 18 at 20, 24-25).

31.     For training purposes, the newly hired Display Planners were paired with an experienced Display Planner as follows: Jason Watson was paired with Karen Metz; Anne Marie Jansen was paired with Karen Donnelly, and Plaintiff was paired with Jason Reed.  (Doc. 18 at 24-25).

32.     Based on Plaintiff's performance over the first six months as a Display Planner, Mitten began to question whether she had the aptitude or skill set to perform in the role.  (Doc. 18 at 42-44, 75).[7]

33.     Mitten had received comments from members of the Hair Care brand team, as well as from other planners, questioning the completeness of Plaintiff's work.  (Doc. 18 at 30-31, 42-44, 75-76).[8]

34.     Mitten also received complaints about planning steps Plaintiff did not take

---

[7]  Plaintiff admits that Mitten testified as such but denies that she lacked the aptitude and skill set insofar as she was receiving inadequate training during this time.  Plaintiff further denies insofar as documents indicate that Mitten identified training gaps which he attributed to Reed. Plaintiff further denies insofar as Mitten gave Plaintiff a raise on Mary 12, 2008.  (Doc. 21 at 140, 141; Doc. 18 at 41-42, Ex. 1; Doc. 20 at 80-81; Doc. 19 at Ex. 1; Ex. 3).

[8]  Plaintiff admits that Mitten testified as such but denies that she lacked the aptitude and skill set insofar as she was receiving inadequate training during this time.  Mitten still recommended a higher score than her trainer and a score that indicated she met performance expectations.  (Doc. 21 at 65-67, 140, 141; Doc. 18 at 32, 35, 45, 41-42, Ex. 1; Doc. 20 at 80-81).

at all and errors with planning she did complete.  (Doc. 18 at 30-31, 75-76).[9]

40.　　With Donnelly as her trainer, Plaintiff was given an opportunity to work with and receive additional training from a highly-regarded, top-rated, experienced planner, who could provide a different approach and a "fresh set of eyes."  (Doc. 18 at 30, 42; Doc. 21 at 129; Doc. 20 at 84-85, Ex. 11).[10]

41.　　Mitten felt that the additional training by Donnelly also would allow him to determine if Plaintiff's performance problems were merely a training issue, or truly a capability issue.  (Doc. 18 at 39-40, 42, 59; Doc. 20 at 85).[11]

42.　　Mitten advised Plaintiff to take full advantage of the training opportunity and work quickly to effectively address her performance gaps.  (Doc. 18 at 59; Doc. 20 at 84-85, Ex. 11).[12]

43.　　He also advised Plaintiff that her "success as a planner really will reside on [her] drive and attention to detail."  (Doc. 20 at 84, Ex. 11).

---

[9]  Plaintiff admits that Mitten testified as such but denies that she lacked the aptitude and skill set insofar as she was receiving inadequate training during this time.  Mitten still recommended a higher score than her trainer and a score that indicated she meet performance expectations. (Doc. 21 at 65-67, 140, 141; Doc. 18 at 32, 35, 45, 41-42, Ex. 1; Doc. 20 at 80-81).  Plaintiff also claims that her trainer, Reed, was removed because of his poor performance.  (Doc. 21 at 140, 141; Doc. 18 at 41-42, Ex. 1; Doc. 20 at 80-81).  Plaintiff claims that Reed had a history of performance deficiencies similar to those for which Plaintiff was allegedly terminated.  (Doc. 18, Exs. 1, 2; Doc. 21 at 65-67, 69, 70, 94-95, 96, 132, 140, 149, 151-152; Doc. 18 at 32, 33, 35, 38-40, 41-42, 45; Doc. 19 at 34; Doc. 21, Exs. 5, 7; Doc. 17 at 22-23, 25-26, 56-57, Ex. 4).

[10]  Plaintiff denied that the training Donnelly provided was "additional" because a significant part of the training was new to Plaintiff.  (Doc. 21 at 140, 141; Doc. 18 at 41-42, Ex. 1; Doc. 20 at 80-81; Doc. 19, Ex. 1).  Also, Donnelly's need for FMLA leave interrupted Plaintiff's training with her.  (Doc. 20 at 89).

[11]  Plaintiff admits that Mitten claimed this was the reason for changing Plaintiff's trainer, but denied insofar as Mitten took Reed's training duties away because of his poor performance. (Doc. 21 at 140, 141; Doc. 18 at 41-42, Ex. 1; Doc. 20 at 80-81).

[12]  With respect to facts 42-43, Plaintiff denies any inference favorable to P&G that she was not meeting Mitten's performance expectations.

44.   Beginning in January 2008, Donnelly developed a comprehensive training plan for Plaintiff and spent a lot of time with Plaintiff reviewing all aspects of training over the next six months.  (Doc. 18 at 59-60, 72-73, 81-82).[13]

45.   However, Plaintiff still did not grasp critical concepts of the job and continued to exhibit performance problems, such as missed plannings and planning errors.  (Doc. 18 at 30-31, 59-60, 68-69, 81-82).[14]

47.   Mitten felt there was "definitely a capability gap between what [Plaintiff] should have known and performed and what she was capable of doing." (Doc. 18 at 82).

48.   In August 2008, Mitten was preparing to transfer to an international position within the Company.  (Doc. 18 at 11).

49.   P&G selected Sharene Taylor to replace Mitten as the CMS Category Manager for Hair Care.  (Doc. 18 at 29).

50.   Mitten met with Taylor regarding all of his direct reports, including Plaintiff.  (*Id.*)

51.   Mitten shared with Taylor that he felt Plaintiff had significant performance deficiencies, especially involving attention to detail and accuracy.  (Doc. 18 at 30-31; Doc. 21 at 89-90).[15]

52.   Mitten explained that Plaintiff had been in "training mode" for almost the entire time he was her manager (over a year).  (Doc. 18 at 30; Doc. 21 at 89-90).

53.   P&G's annual review process begins in the late summer early fall of each

---

[13]  Plaintiff claims that this training was not "additional" because a significant part of the training Donnelly provided was new to her.  (Doc. 21 at 140, 141; Doc. 18 at 41-42 and Ex. 1; Doc. 20 at 80-81; Doc. 19 at Ex. 1).  Plaintiff also claims that Donnelly's need for FMLA leave interrupted her training.  (Doc. 20 at 89).

[14]  Plaintiff admits that Mitten testified to this, but denies insofar as Mitten took Reed's training duties away because of his poor performance.  (Doc. 21 at 140, 141; Doc. 18 at 41-42, Ex. 1; Doc. 20 at 80-81).

[15]  With respect to undisputed facts 51-52, Plaintiff admits that Mitten and Taylor testified as such.  However, Plaintiff denies insofar as Mitten recommended to Taylor a meets expectations (2) rating for Plaintiff.  (Doc. 20 at 118; Doc. 21 at 65-67; Doc. 19 at 97).

year. A "1" rating is the highest and represents the top performers who have been highly successful and have exceeded expectations during the fiscal year (July 1 to June 30), and a "3" rating is the lowest and represents those employees who are not meeting performance expectations relative to their peers.  (Doc. 19 at 23-24, 31, 72).

54.  Ratings recommendations are reviewed and analyzed during a multi-step process, which includes a comparison against peers and several levels of calibration.  (Doc. 19 at 31-32, 72-75; Doc. 21 at 66-67, 99-101).

55.  In 2008, Mitten advised Taylor he was recommending an annual rating of "low 2" or "2-" for Plaintiff.  (Doc. 18 at 32, 81-82).  Mitten's recommended rating for Plaintiff in 2008 actually gave Plaintiff the benefit of the doubt for the first six months when her performance could have been impacted by the initial training Plaintiff received from Reed.  (*Id.* at 81-82).[16]

56.  Based on Mitten's recommendation and the subsequent calibrations, Plaintiff ultimately received a "3" rating when she was compared against her peers.  (Doc. 19 at 72-75; Doc. 21 at 66-67, 90, 93, 99-101).[17]

57.  Plaintiff's "3" rating in 2008 was Plaintiff's first true rating, as she was an automatic "2" in 2007 since she had only worked at P&G for a little over a month before the fiscal year ended.  (Doc. 21 at 93).

58.  Mitten further noted to Taylor that Plaintiff was well behind the curve, as compared to the other new hires, Watson and Jansen.  (Doc. 18 at 39, 44-45).[18]

59.  Prior to transitioning to his new role, Mitten also completed his portion of Plaintiff's Work & Development Plan ("W&DP") and shared it with

---

[16]  Plaintiff admits Mitten testified as such, but denies insofar as Mitten told her he was recommending a 2 rating for her.  (Doc. 20 at 118; Doc. 21 at 65-67; Doc. 19 at 97).

[17]  With respect to undisputed facts 56-57, Plaintiff denies that her performance merited a 3 as Mitten told her he was recommending a 2.  (Doc. 20 at 118; Doc. 21 at 65-67; Doc. 19 at 97).

[18]  Plaintiff denies insofar as Reed had a history of performance deficiencies similar to those for which she was allegedly terminated without being terminated.  Additionally, Plaintiff denies insofar as Mitten told her he was recommending a 2 rating for her and this statement assumes that Watson and Jansen received the same poor training as Plaintiff when they did not.  (Doc. 20 at 80-81, 118; Doc. 21 at 65-67, 140, 141; Doc. 19 at 97; Doc. 18 at 41-42, Ex. 1).

Plaintiff.  (Doc. 18 at 65-67; Doc. 20 at 85, Ex. 12).

60.     The W&DP includes the employee's action plan, a review of the results
        delivered, a work plan for the year ahead, strengths and opportunity areas,
        and career interests. W&DPs are completed periodically, but the timing will
        vary based on the role, the business unit, and the tenure of the employee.
        (Doc. 17 at 31-32).

61.     Mitten specifically noted in Plaintiff's W&DP: "Tina does not always
        operate with the sense of urgency and awareness that is required in the
        planner's role. The existing work processes dictate the accuracy and
        timeliness of plans and codes and Tina is not always on top of
        these items. This causes rework and time loss in the systems which then
        requires additional resources to engage." (Doc. 20 at 86-87, Ex 12).[19]

62.     In their meeting, Mitten emphasized to Plaintiff that, going forward, she
        needed to commit to Taylor that she would improve these issues.  (Doc. 20
        at 93, Ex 12).

63.     Taylor officially took over as the CMS Manager for Hair Care in
        September, 2008.  (Doc. 21 at 12).

64.     During her first two weeks in the role, consistent with what Mitten had
        advised her about Plaintiff's performance, Taylor observed for herself
        multiple performance outages by Plaintiff involving data accuracy,
        incomplete or inaccurate planning execution, and a lack of follow through.
        (Doc. 21 at 157, 160-165; Doc. 20 at 95-99, 104, Ex. 13).

65.     In September 2008, Taylor met with Plaintiff to discuss her outages and
        required that Plaintiff develop an action plan to address them.  (Doc. 21 at
        157-160, Doc. 20 at 95- 99, Ex. 13).

66.     In the meeting and documentation regarding her September 2008 File Entry,
        Taylor made clear to Plaintiff that continued performance problems could

---

[19]  With respect to undisputed facts 61-62, 64-66, Plaintiff denies insofar as Reed had a
history of performance deficiencies similar to those for which she was allegedly terminated.
(Doc. 18 at Exs. 1, 2; Doc. 21 at 65-67, 69, 70, 94-95, 96, 132, 140, 149, 151-152; Doc. 18 at 32,
33, 35, 38-40, 41-42, 45; Doc. 19 at 34; Doc. 21 at Exs. 5, 7; Doc. 17 at 22-23, 25-26, 56-57 and
Ex. 4).

result in disciplinary action, up to termination.  (Doc. 21 at 157-160; Doc. 20 at 112, 116, Ex. 13).

67.    In September 2008, Plaintiff documented her commitments to improve her performance, specifically her accuracy and timeliness.  (Doc. 21 at 159-160, Doc. 20 at 107-108, Ex. 14).

68.    Taylor and Plaintiff met to review Plaintiff's commitments.  (Doc. 21 at 159-160, 166; Doc. 20 at 107-108, 110-112, Ex. 15).

69.    During a meeting, Taylor asked if Plaintiff's workload was contributing to her performance issues, but Plaintiff said that it was not a problem.  (Doc. 20 at Ex 15).

70.    Taylor also asked Plaintiff to continue to work with Donnelly to ensure that Plaintiff understood the issues and learned from her mistakes.  (Doc. 20 at Ex. 15).[20]

71.    Additional issues concerning Plaintiff's performance were discovered in September and October 2008.  (Doc. 21 at 167-168; Doc. 20, Ex. 15-16).

72.    In fact, Plaintiff made significant planning mistakes in September 2008 that directly impacted P&G's business with one of its primary customers, Target.  (Doc. 17 at 44-48, Ex. 1-4; Doc. 20, Ex. 15).[21]

73.    Plaintiff's mistakes were so significant that an Associate Director for P&G's Target Team, Jorge Carlos Gonzales Rico, contacted Kristine Mauro, the Associate Director for CMS, to ask how she was handling the

---

[20]    With respect to undisputed facts 70-71, Plaintiff denies insofar as Reed had a history of performace deficiencies similar to those for which she was allegedly terminated without being terminated.  (Doc. 18 at Exs. 1, 2; Doc. 21 at 65-67, 69, 70, 94-95, 96, 132, 140, 149, 151-152; Doc. 18 at 32, 33, 35, 38-40, 41-42, 45; Doc. 19 at 34; Doc. 21, Exs. 5, 7: Doc. 17 at 22-23, 25-26, 56-57, Ex. 4).

[21]    With respect to undisputed facts 72-75, Plaintiff denied that the planning mistake was any more significant than those made by Reed without triggering a PIP or termination for him and Taylor admitted that the Target team believed she had improved when she was terminated. (Doc. 18 at Exs. 1, 2; Doc. 21 at 65-67, 69, 70, 94-95, 96, 132, 140, 149, 151-152; Doc. 18 at 32, 33, 335, 38-40, 41-42, 45; Doc. 19 at 34; Doc. 21 at Exs. 5, 7; Doc. 17 at 22-23, 25-26, 56-57, Ex. 4; Doc. 19, Ex. 9).

-10-

staffing concerns.  (Doc. 17 at 44-48, Ex. 1).

74.   Referring to Plaintiff, Gonzales Rico specifically asked Mauro to "fire her." (Doc. 17 at 45).

75.   Mauro explained to Gonzales Rico that Plaintiff's performance would be managed appropriately and in accordance with the normal processes.  (Doc. 17 at 45).

76.   Taylor and Mauro discussed Plaintiff's ongoing performance and decided to reach out to Human Resources for some guidance on how address the situation.  (Doc. 17 at 57, 60-62; Doc. 21 at 170; Doc. 19 at Ex. 1).[22]

77.   Taylor and Mauro specifically sought some direction on whether to place Plaintiff on a formalized Performance Improvement Plan ("PIP") or if termination was an option at that time.  (Doc. 21 at 121-123, 171-172; Doc. 19 at 69-70, Ex. 1).

78.   At that time, based on Taylor's own observations of Plaintiff's work, Taylor had serious concerns about whether Plaintiff would ever be capable of managing a planning desk.  (Doc. 21 at 129, Doc. 17 at Ex. 2-4).[23]

80.   Ultimately, after careful consideration, the decision was made to place Plaintiff on a PIP, rather than terminating her at that time, and provide her with yet another opportunity to improve her performance.  (Doc. 17 at 60-62; Doc. 19 at 69; Doc. 21 at 171-172).[24]

81.   In January 2009, Taylor and Janet Nelson, the Human Resources Manager for CMS, met with Plaintiff to discuss her "3" rating and her placement on

---

[22]  With respect to undisputed facts 76-77, Plaintiff denies insofar as Taylor wanted to terminate her by October 8, 2008.  (Doc. 17, Ex. 4).

[23]  Plaintiff denies insofar as Reed had a history of performace deficiencies similar to those for which she was allegedly terminated without being terminated.  (Doc. 18, Exs. 1, 2; Doc. 21 at 65-67, 69, 70, 94-95, 96, 132, 140, 149, 151-152; Doc. 18 at 32, 33, 35, 38-40, 41-42, 45; Doc. 19 at 34; Doc. 21, Exs. 5, 7; Doc. 17 at 22-23, 25-26, 56-57; Doc. 17, Ex. 4).

[24]  Plaintiff denies insofar as Taylor wanted to terminate her by October 8, 2008 and Taylor only put her on a PIP because Lennon advised it.  (Doc. 17 at Ex. 4; Doc. 19 at 59-60, 63-64, 69, 70).

the PIP.  (Doc. 19 at 77-78; Doc. 20 at 117-121, Ex. 17).

82.    Taylor once again stressed to Plaintiff the need to focus on improving her performance, specifically in data accuracy, timeliness, and technical mastery in SAP.  (Doc. 20 at 117-121, Ex. 17).[25]

83.    Plaintiff understood the need for improvement and committed herself to delivering against the plan.  (Doc. 20 at 122-123, 150, Ex. 17).

84.    Plaintiff's PIP was designed so that Plaintiff could focus on meeting the base expectations of her position and attempt to bring her performance up to a level equivalent to her peers and sustain it over a 90-day period.  (Doc. 21 at 175-176, 184-186; Doc. 19 at 52-54; Doc. 20 at Ex. 18).[26]

85.    The PIP specifically set forth key areas for improvement and defined the success measures.  (Doc. 21 at 175-176; Doc. 20 at 126, Ex. 18).

87.    Plaintiff also was advised that the "[f]ailure to meet the expectations of this Performance Improvement Plan can result in actions up to and including termination."  (Doc. 20 Ex. 18).[27]

88.    Initially, Plaintiff made some progress toward meeting her base expectations, and Taylor felt she was improving.  (Doc. 21 at 192-200; Doc. 20, Ex. 18).

89.    However, in March 2009, while Plaintiff still was on the PIP, two significant mistakes made by Plaintiff were identified.  (Doc. 21 at 206-208,

---

[25]  With respect to undisputed facts 82-83, Plaintiff denies insofar as Reed had a history of performance deficiencies similar to those for which she was allegedly terminated without being terminated.  (Doc. 18 at Exs. 1, 2; Doc. 21 at 65-67, 69, 70, 94-95, 96, 132, 140, 149, 151-152; Doc. 18 at 32, 33, 35, 38-40, 41-42, 45; Doc. 19 at 34; Doc. 21, Exs. 5, 7; Doc. 17 at 22-23, 25-26, 56-57,Ex. 4).

[26]  Plaintiff denies insofar as Taylor wanted to terminate Plaintiff by October 8, 2008.  (Doc. 17, Ex. 4).

[27]  Plaintiff denies insofar as Reed had a history of performace deficiencies similar to those for which she was allegedly terminated without being terminated.  (Doc. 18, Exs. 1, 2; Doc. 21, 65-67, 69, 70, 94-95, 96, 132, 140, 149, 151-152; Doc. 18 at 32, 33, 35, 38-40, 41-42, 45; Doc. 19 at 34; Doc. 21, Exs. 5, 7; Doc. 17 at 22-23, 25-26, 56-57, Ex. 4).

Doc. 20 at 138-142, Ex. 18, 20).[28]

90.     These mistakes involved the same significant issues that Plaintiff exhibited throughout her entire time in the Display Planner role - accuracy and timeliness.  (Doc. 21 at 206-208, Doc. 20 at 138-142, Ex. 18, 20).

91.     Plaintiff's mistakes had the potential to result in service disruptions, rework, or unnecessary time or money spent on expediting product or materials.  (Doc. 21 at 206-208, Doc. 20, Ex. 20).

92.     For instance, one of Plaintiff's errors required P&G to expedite materials from Mexico City and caused significant changes in the supply chain, as a supplier had to change over its production and make the needed caps.  (Doc. 21 at 206-207; Doc. 20 at 139, Ex. 20).

**D.      Plaintiff's Termination**

94.     Overall, Taylor concluded that Plaintiff still had not demonstrated the ability to perform the basic requirements of the role, particularly over a sustained period, so Taylor recommended Plaintiff's termination.  (Doc. 21 at 210-212, 215-216; Doc. 17 at 79).

95.     While Human Resources and P&G's Legal Departments review termination recommendations and may provide coaching and guidance to the actual decision-maker, ultimately the decision is made by the authorized manager in the employee's specific business unit.  (Doc. 21 at 211, 215; Doc. 19 at 131-132, 135; Doc. 17 at 78-81; Doc. 20 at 196).[29]

96.     Mauro, the authorized decision-maker, reviewed Plaintiff's overall performance during her two years of employment, including her performance on the PIP, and concluded that Plaintiff was not fulfilling the requirements of the display planner role.  (Doc. 17 at 78).

---

[28]  With respect to facts 89-92, and 94, Plaintiff denies insofar as Reed had a history of performace deficiencies similar to those for which she was allegedly terminated without being terminated.  (Doc. 18, Exs. 1, 2; Doc. 21 at 65-67, 69, 70, 94-95, 96, 132, 140, 149, 151-152; Doc. 18 at 32, 33, 35, 38-40, 41-42, 45; Doc. 19 at 34; Doc. 21, Exs. 5, 7; Doc. 17 at 22-23, 25-26, 56-57, Ex. 4).

[29]  With respect to facts 95-97, Plaintiff denies insofar as Mauro made the decision following Taylor's recommendation that she be terminated.  (Doc. 17  at 79).

97.   Mauro, therefore, decided to terminate Plaintiff's employment. (Doc. 17 at 78).

99.   Taylor and Nelson notified Plaintiff of the decision to terminate her employment on May 27, 2009. (Doc. 21 at 220; Doc. 19 at 128-129).

100.   Plaintiff was provided four weeks of severance pay. (Ex. A).

## II.   STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

# III.   ANALYSIS

## A.   Race/National Origin Discrimination[30]

Plaintiff claims that P&G discriminated against her on the basis of race and national origin in violation of federal and Ohio law.[31]

To make a *prima facie* race/national origin discrimination claim, the plaintiff must allege sufficient facts showing that she: (1) was a member of a protected class; (2) suffered an adverse employment action; (3) was qualified for the position; and (4) was replaced by someone outside the protected class or treated differently than similarly-situated, non-protected employees.  *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008).

Once a plaintiff has made a *prima facie* case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the decision.  *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973).  Under *McDonnell Douglas*, the burden of production may shift from the plaintiff to the defendant, but the burden of persuasion remains with the plaintiff throughout the analysis.  *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1390 (6th Cir. 1993).  If the defendant meets this burden, then the presumption created from the *prima facie* case drops out and plaintiff has "an

---

[30]  Plaintiff's race and national origin claims are analyzed under the same framework.  *Russell v. University of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008) (race discrimination); *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004) (national origin discrimination).

[31]  Because the elements of a discrimination case are the same under federal Title VII law and Ohio law, these claims can be considered together.  *Graham v. Best Buy Stores*, 298 Fed. Appx. 487, 493 fn. 5 (6th Cir. 2008).

opportunity to prove . . . that the proffered reasons were not the true reason for the

employment decision, but were a pretext for discrimination." *Texas Dep't of Cmty.*

*Affairs v. Burdine*, 450 U.S. 248, 248 (1981).

### 1.    *Prima Facie* **Case**

There is no dispute that Plaintiff is a member of the protected class, nor that she

suffered an adverse action when she was terminated.  Only two elements of the *prima*

*facie* case analysis are in dispute: (1) whether Plaintiff was qualified for the job; and (2)

whether Plaintiff was replaced by someone outside the protected class or treated

differently than similarly-situated, non-protected employees.

### a.    *Qualified for the job*

In order to state a *prima facie* case that she was qualified for her position, Plaintiff

need only demonstrate that she was objectively qualified for the position.  *Wexler v.*

*White's Fine Furniture, Inc.*, 317 F.3d 564, 574-76 (6th Cir. 2003).  The Sixth Circuit

held that courts are not to use the defendant's articulated nondiscriminatory reason for

termination to assess whether the plaintiff was qualified for the position.  *Id.* at 574.

Instead, courts must analyze Plaintiff's qualifications independent of the defendant's

nondiscriminatory reason for termination.  *Id.* at 574-575.  This inquiry should focus on

plaintiff's education, experience in the relevant industry, and demonstrated possession of

the required general skills.  *Id.* at 576.  As the *prima facie* case is not intended to be

burdensome, detailed analysis at this stage on whether a plaintiff is "qualified" is

improper.  *McCrory v. Kraft Food Ingredients*, No. 94-6505, 1996 U.S. App. LEXIS 26305, at *14 (6th Cir. Oct. 3, 1996).

First, Defendant argues that Plaintiff never demonstrated during her two years in the Display Planner position, that she possessed the requisite skill set to perform at even the most basic level required for the position.[32]  Second, Defendant maintains that the record evidence shows that Plaintiff was not objectively qualified, because she lacked any meaningful logistics experience and never demonstrated that she possessed the required skills to do the job at P&G.  (Doc. 20 at 21, 25-28, 58-59, 129, 138-142, 150; Doc. 18 at 82).

Defendant's argument that Plaintiff was not qualified for her position, as documented by her performances failures, improperly conflates the stages of the burden-shifting analysis.  *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000) (warning against importing the later stages of the McDonnell Douglas inquiry into the initial *prima facie* stage).  The Court's consideration of the nondiscriminatory reason offered by Defendant is properly reserved for the second stage of the McDonnell Douglas analysis.  *Id.* at 662.[33]

More importantly, the record indicates that Plaintiff was objectively qualified.

_____

[32]  Plaintiff admittedly continued to make the same critical errors involving timing and accuracy.  (Doc. 20 at 129, 138-142, 150).

[33]  Defendant, however, argues that to the extent Plaintiff's performance reflects whether or not she actually possessed the capability or basic required skills necessary to perform her duties is an appropriate analysis at the *prima facie* stage.  *Webb v. Servicemaster*, No. 10-6520, 2011 U.S. App. LEXIS 19018, at *4-6 (6th Cir. Sept. 14, 2011).  The Court disagrees with Defendant's interpretation of *Webb*, which is factually distinguishable from the instant case.

Defendant's own description of the Display Planner position demonstrates that planning experience was not required.  (Doc. 20, Ex. 5).  Instead, it required applicants to be "excellent communicators," who had effective collaboration skills, discipline, and problem solving ability.  (*Id.*)  A jury could conclude that Plaintiff's B.S. in English and Communication and her previous logistics experience provided her with these skills as well as the "technical master" of computer application and mathematic skills P&G required of its planners.  (*Id.*)

Based on this Court's analysis at the *prima facie* stage, a reasonable jury could conclude that Plaintiff was qualified for the position.

### b.      *Replaced by someone outside the protected class*

Next, Plaintiff must establish that she was replaced by or treated differently than an employee outside her protected class.  Replacement occurs where "another employee is hired or reassigned to perform the plaintiff's duties."  *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003).  "Spreading the former duties of a terminated employee among the remaining employees does not constitute replacement."  *Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992).

Defendant argues that Plaintiff was not replaced, but rather that other Hair Care Display Planners assumed Plaintiff's display planning responsibilities upon her termination.  (Doc. 21 at 219; Ex. B).  While Taylor eventually posted an open Display Planner Role, she did not do so until September 2009 (four months after Plaintiff's

termination), and the role was not filled until January 2010 (approximately seven months after Plaintiff's termination).  (Taylor Aff. at ¶¶ 8-10).[34]  This is too long, as a matter of law, to be a reasonable period to show replacement.  *Cottles v. Bank of America*, No. 06C2068, 2008 U.S. Dist. LEXIS 32513, at *31 (N.D. Ill. Mar. 31, 2008) ("four months is well beyond a reasonable period of proximity" when determining whether a plaintiff satisfied the *prima facie* element of replacement).[35]

Therefore, Plaintiff fails to establish that she was in fact replaced.

### c.  Similarly situated

Alternatively, Plaintiff does not establish that P&G treated a comparable, similarly-situated employee more favorably.  *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (2002).  To be similarly situated, the employees must have engaged in the same conduct or performance "without such differentiating or mitigating circumstances that would

---

[34] Plaintiff argues that Taylor's deposition testimony contradicts her affidavit and should not be considered by the Court.  (Doc. 28 at 4).  On September 1, 2011, Taylor testified:

Q.    Did you post for Tina's position after she was terminated?
A.    We did eventually, but it wasn't immediately afterwards.
Q.    Do you know who filled the position that you posted?
A.    I believe it was Carol Miller.

(Doc. 21 at 219).  The Court finds that this testimony does not contradict Taylor's affidavit.  The affidavit simply includes additional information about why the position was not immediately posted.  The reasoning is irrelevant for purposes of the Court's analysis.

[35] Plaintiff cites *Morvay v. Maghielse Tool & Die Co.*, 708 F.2d 229, 233 (6th Cir.), *cert. denied*, 464 U.S. 1001 (1983), for the proposition that a plaintiff may demonstrate that the employer continued to solicit applications for the vacant position after the plaintiff was terminated to establish the last element of the *prima facie* case.  The Court finds *Morvay* to be inapposite, as there is no record evidence that P&G solicited applications to replace Plaintiff until four months after her termination.

distinguish [them] or the employer's treatment of them for it.'" *Id.* at 661. A plaintiff satisfied the fourth prong where he or she demonstrates that a "comparable non-protected person was treated better." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582-83 (6th Cir. 1992). The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered "similarly-situated." *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994).

Plaintiff presents evidence of comparator Jason Reed, alleging that Mr. Reed received more favorable treatment when it came to P&G tolerating and/or overlooking performance problems. Jason Reed, like Plaintiff, had performance issues as a Display Planner during 2008-2009. The Court, however, finds critical differences between the two employees in experience, length of service with P&G, ability to perform the job, and the actual results of each employee's efforts to achieve satisfactory performance.

Plaintiff claims that a jury could conclude that Mr. Reed was repeatedly disciplined for mistakes and performance failures remarkably similar to those P&G claims motivated Plaintiff's termination. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 282 (1976) (plaintiff must prove that one or more employees, not in the protected group, who had engaged in acts of "comparable seriousness, . . . were nevertheless retained or rehired."). For example: (1) P&G coworkers complained about Mr. Reed's need for repeated instruction and the extra work imposed on them to remedy his mistakes; (2) Mr. Reed was disciplined for potential lost business and mistakes which

involved extra cost to P&G; (3) P&G claimed that both Plaintiff's and Mr. Reed's work was incomplete; (4) Plaintiff lacked a sense of urgency and Mr. Reed had no initiative and was not proactive; and (5) both Mr. Reed and Plaintiff were criticized for alleged failure to follow through.

However, Mr. Reed was not similarly situated to Plaintiff. *White v. Ford Motor Co.*, No. 1:07cv89, 2008 U.S. Dist. LEXIS 77040, at *17 (N.D. Ohio 2008) ("The Sixth Circuit has consistently recognized that employees who are substantially more experienced are not 'similarly situated'"). Jason Reed started his employment with P&G in 2001 as part of P&G's acquisition of Clairol from Bristol-Meyers Squibb, where Reed already was employed at the time of the acquisition. (Nelson Aff at ¶ 5; Doc. 18 at 32-33).[36] By the spring of 2009 when the decision was made to terminate Plaintiff, Reed had almost eight years of service and experience with P&G, while Plaintiff had been employed for about two years. (Doc. 20 at 56, Ex. 4). This distinction in the length of service is relevant in preventing the employees from being similarly situated. In *Jones v. Coba-Geigy, Inc.*,[37] the Sixth Circuit held that differing lengths of service between a 15 year and a 2 year employee "prevented them from being comparable or similarly-situated

---

[36] *Fuelling v. New Vision Med. Labs, LLC*, 284 Fed. Appx. 247 (6th Cir. 2008) (plaintiff failed to provide information such as position, job responsibilities, years of experience, length of tenure, or disciplinary history that would indicate whether the employees were similarly situated in all relevant respects).

[37] Plaintiff attempts to distinguish *Jones* on the grounds that the comparator, Kathy Norris, had a different supervisor and eight years of service as District Manager, while Jones had only two years of service as a District Manager. However, the Court notes that these facts are nearly identical to the instant case.

employees."  No. 96-1573, 1997 U.S. App. LEXIS 27074, at *13-14 (6th Cir. Sept. 25, 1997).[38]  Moreover, the very fact that Mr. Reed was Plaintiff's *trainer*, solidifies that the two cannot be considered similarly situated.

Mr. Reed also had a different work record and history of performance than Plaintiff.  Mr. Reed had shown the ability and aptitude to do the work.  (Doc. 18 at 32-33, 57; Doc. 21 at 70, 95, 129-130; Nelson Aff at ¶ 6; Doc. 17 at 22-23).[39]  Mr. Reed's problems were allegedly motivational – keeping him interested and engaged with work and as he became disinterested or distracted his performace would dip and he would need a "kick in the pants" to get back on track again.  (Doc. 18 at 32-33; Doc. 17 at 22-23; Doc. 21 at 129-130).  This was allegedly one of the factors in the decision to transfer Reed to the Skin Group in November 2008, to reinvigorate Reed.[40]

_____

[38]  ("Many past years of good service may justify a more lenient corporate response to an employee's poor judgment or misconduct.  The employee's past track record may well suggest that the inappropriate behavior in question is isolated or aberrant, and thus more likely to be remediable.  On the other hand, an employer rationally may decide to terminate a relatively new employee who poses problems as his or her future behavior is less predictable; in this circumstance an employer can only hope that the inappropriate conduct in question is not usual or intransigent.").

[39]  Defendant presented evidence in the form of an affidavit from Janet Nelson, that from 2001 when he started with P&G until 2008, Mr. Reed consistently received a "2" rating for his performance.  (Nelson Aff. at ¶6).  However, Plaintiff points out that in her deposition, Nelson could not recall Reed's performance ratings prior to 2008, and that Defendant never supplemented Nelson's response.  (Doc. 28 at 2).  In an abundance of caution, the Court will disregard Mr. Reed's performance ratings prior to 2008.  Regardless, the performance ratings are only one of many forms of evidence in the record for the Court's review.

[40]  Reed's performance under his new manager in Skin Care was good and he received a "2" rating for 2009.  (Nelson Aff. at ¶ 10-11, Ex. B).

Finally, Plaintiff and Reed[41] achieved different results after being placed on their respective performance management plans in the Winter/Spring of 2009.  Reed's performace improved to an acceptable level.  (Nelson Aff at ¶ 10, Ex. B).  Reed was able to raise the level of his performance such that he received a "2" rating in 2009.  (Nelson Aff at ¶ 10).  Plaintiff, however, did not make improvements to her performance.  It is undisputed that she continued to make the same critical errors during her PIP.  Even after Plaintiff's termination, Taylor continued to discover serious planning errors made by Plaintiff which needed to be addressed by the business.  (Doc. 25, Ex. I).  Moreover, the errors made by Plaintiff were significant and of the same nature that she made throughout her employment.  In fact, Plaintiff never showed the capability to successfully perform the basic responsibilities of the Display Planner role.[42]  (Doc. 18 at 30-31, 39, 42-44, 59-60, 72-73, 75, 81-82; Doc. 21 at 129, 157-160, 206-208, 210-212, 215-16; Doc. 17 at 44-48, Ex. 2-4; Doc. 20 at 138-142, Ex. 15-16, 18, 20).[43]

Therefore, in comparing Plaintiff and Mr. Reed, it is clear that the record evidence does not support a finding that the two were similarly situated.  Therefore, Plaintiff fails to establish a *prima facie* case of discrimination.

---

[41]  In conjunction with the discussion regarding his "3" rating, Reed was placed on an aggressive work plan, which is another tool used by CMS to manage performace.  (Nelson Aff. at ¶ 9).

[42]  Although Plaintiff avoids admitting or denying many alleged mistakes, she never denies that she made the mistakes referenced.  Instead, she simply notes that Reed also had a history of performance deficiencies.  (*See* Doc. 23, Ex. 2).

[43]  Both Mitten and Taylor questioned whether she would ever be able to perform the role satisfactorily.  (Doc. 18 at 38, 39, 42-44, 75, 82; Doc. 21 at 129-130, 212; Doc. 17 at 51-52; Ex, 2, 4).

## 2.    Defendant's non-discriminatory reason for termination

Even if Plaintiff had established a *prima facie* case of race/national origin

discrimination, which she has not, her claims would still fail because P&G has met its

burden of articulating a legitimate, nondiscriminatory reason for Plaintiff's discharge, and

Plaintiff cannot demonstrate that P&G's stated reason was pretext for unlawful

discrimination.  *McDonnell Douglas*, 411 U.S. at 802-804.

Both of Plaintiff's immediate managers – Mitten and Taylor –  alleged serious

issues regarding Plaintiff's unacceptable performance, and both explained the

consequences if she could not raise the level of her performace and perform her job duties

without making significant mistakes.  Plaintiff was provided with a structured PIP to

improve her performance for a 90-day period.  However, she continued to make

significant mistakes and the business was no longer willing to expend any more resources

on her.  (Doc. 17 at 78).

The record shows that Plaintiff and Reed had significantly different experience

levels, lengths of service with the Company, performance records with the Company,

capability levels, and success (or lack thereof) in improving their performance.  It was

appropriate for Defendant to consider each of these facts when making decisions

regarding its employees.  Defendant's proffered explanation for discharging Plaintiff is

"clear and reasonably specific" and "is arguable supported by admissible evidence which

would allow the trier of fact rationally to conclude that the employment decision [was]

not motivated by discriminatory animus."  *White v. Baxter Healthcare Corp.*, 533 F.3d

-24-

381, 392 (6th Cir. 2008).

### 3.    Pretext for discriminatory animus

In order to establish that P&G's explanation for Plaintiff's termination is improper, and establish pretext, Plaintiff must demonstrate that the reasons given by P&G for her discharge: (i) had no basis in fact, or (ii) did not actually motivate the decision, or (iii) were not sufficient to warrant the action taken.  *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994).  The first type of proof requires that Plaintiff show that the bases for the termination never happened or are factually false.  *Id.*  The second type of proof consists of a demonstration that "an illegal motivation was more likely than [the reasons] offered by the defendants."  *Id.*  The third type of proof consists of evidence that other employees outside the protected classes but otherwise similarly situated to Plaintiff were not terminated.  *Id.*  A *prima facie* case plus a showing that Defendant's articulated reason is false is sufficient for Plaintiff to prevail.  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-510 (1993).

In arguing that Plaintiff lacked the necessary skills for a Display Planner, Plaintiff maintains that P&G relied heavily on hearsay evidence that Taylor, the Associate Director for P&G's Target team, requested Plaintiff's termination.[44]  Plaintiff alleges that

---

[44]  Reed, like Plaintiff was subjected to performance management and was given file entries in 2008.  Notably, for the short two month period when both were managed by Taylor, both received file entries and were asked to develop action plans.  In fact, their first file entries were given within two days of each other.  (Doc. 21, Ex. 7; Doc. 20, Ex. 13).

a jury could consider how quickly Taylor began preparing for Plaintiff's termination and
conclude that her membership in a protected class, rather than her performance, motivated
the termination decision.  Plaintiff maintains that this conclusion is supported by Taylor's
rejection of Mitten's recommendation that Plaintiff received a 2- on her performance
evaluation.  However, Mitten, questioned whether Plaintiff had the capability to perform
the role.[45]  Moreover, Plaintiff had a history of performance issues prior to Taylor's
arrival as her manager.

Therefore, Plaintiff's claims for race/national origin discrimination fail as a matter
of law.

## B.     Disability Discrimination

In order for Plaintiff to establish a *prima facie* case of disability discrimination,
Plaintiff must prove that: (1) she is disabled; (2) she is otherwise qualified for her
position; (3) she suffered an adverse employment action; (4) the employer knew or had
reason to know of her disability[46]; and (5) similarly situated employees outside of the

---

[45]  Plaintiff's claim that Taylor rejected Mitten's recommendation that Plaintiff received a "2-
is without evidentiary support.  The record reflects that Taylor provided Mitten's
recommendations to the other managers during the calibration sessions involving numerous
managers.  (Doc. 21 at 65-67).  A single manager's recommendation is not a guarantee that an
employee will receive a specific rating, as it is a force ranking process and multiple levels of
calibration take place where individuals are evaluated against their peers.  After completion of
the entire process Plaintiff received a "3" rating.

[46]  The ADA defines a disability as: (1) a physical or mental impairment that substantially
limits one or more major life activity; (b) a record of such impairment; or (c) being regarded as
having such an impairment.  42 U.S.C. § 12102(2).  "An individual meets the requirement of
'being regarded as having such an impairment' if the individual establishes that he or she has
been subjected to an action prohibited under this chapter because of an actual or perceived
physical or mental impairment whether or not the impairment limits or is perceived to limit a
major life activity."  42 U.S.C. § 12012(3)(A).

protected class were treated better or the plaintiff's position was filled by someone outside of the protected class. *Scott v. FirstMerit Corp.*, 167 F. App'x 480, 487 (6th Cir. 2006).

Plaintiff's claim fails because there is no evidence that Mauro knew or should have known about Plaintiff's Rheumatoid Arthritis when she made the decision to terminate Plaintiff's employment. *Walsh v. United Parcel Service*, 201 F.3d 718, 725 (6th Cir. 2000). "[A] defendant cannot discriminate 'because of' a disability if it has no knowledge of this disability." *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 884 (6th Cir. 1996). Ms. Mauro was not aware of Plaintiff's medical condition until after she filed her lawsuit. (Doc. 17 at 38).[47]

In the alternative, Plaintiff claims that because Taylor knew of her disability and recommended her termination, a jury could conclude that P&G was at fault because Taylor intended to cause Plaintiff's termination and was motivated by her disability.[48] Plaintiff also imputes a "discriminatory animus" to Taylor. However, there is no evidence in the record that Taylor had any discriminatory animus toward Plaintiff.

---

[47] Plaintiff argues that a reasonable jury could find that Mauro was aware of Plaintiff's disability through her interaction with Plaintiff. In support of this argument, Plaintiff relies on three cases where courts rejected the defendant's claims that the decision maker was not aware of the plaintiff's specific protected class. (Doc. 23 at 13). These cases are distinguishable because none involves a plaintiff with a disability. Here, there is no evidence to suggest Mauro ever noticed Plaintiff limping or spoke to anyone about her condition.

[48] Taylor first started taking notes regarding Plaintiff's negative performance in late August. (Doc. 21 at Ex. 8). Plaintiff did not tell Taylor about her medical condition until September 3, through email. There is no evidence that Taylor knew of her medical condition prior to Plaintiff's email. (*Id.* at 114, Ex. 4).

Therefore, Plaintiff's claim for disability discrimination fails as a matter of law.

## IV.   CONCLUSION

Based on the evidence of record, the Court finds that there are no genuine issues of material fact for trial, and that Defendant is entitled to judgment as a matter of law on all counts of the complaint.  Therefore, Defendant's motion for summary judgment (Doc. 9) is **GRANTED**, and this case is **CLOSED**, upon the Clerk's entry of judgment.

**IT IS SO ORDERED.**

Date:   ___1/20/12___

_Timothy S. Black_
Timothy S. Black
United States District Judge